COMMONWEALTH OF MASSACHUSETTS, Plaintiff,

v.

BULL HN INFORMATION SYSTEMS, INC., Defendant.

Equal Employment Opportunity Commission, Plaintiff,

v.

Bull HN Information Systems, Inc., Defendant.

Robert F. Madigan, Plaintiff,

v.

Bull HN Information Systems, Inc., Defendant.

No. CIV. 97–11326NG, CIV. 97–11327NG, CIV. 97–12450NG.

United States District Court, D. Massachusetts.

May 29, 2001.

---

Catherine C. Ziehl, Attorney General's Office, Boston, MA, for Commonwealth of Massachusetts.

Michael J. O'Brien, EEOC, NY District Office, New York, NY, for Equal Employment Opportunity Commission.

Jodie Grossman, Boston, MA, for Robert F. Madigan.

Joan A. Lukey, Robyn B. Klinger, Michael G. Bongiorno, Hale & Dorr, Boston, MA, Karen Katz, Hale and Dorr, Boston, MA, for Bull HN Information Systems, Inc.

## MEMORANDUM AND ORDER RE: PARTIES' MOTIONS FOR SUMMARY JUDGMENT

GERTNER, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138
 A. The Commonwealth and the EEOC's Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

B. *Madigan's Claims* ........................................... 139

II. *BACKGROUND* ............................................. 139
 A. *Age–Discrimination Allegations, 1990—1994* ............................ 140
 B. *Bull's Severance Pay Plan and Releases, 1994—1998* .................... 140
 C. *The Instant Litigation* ........................................ 140
 D. *The Madigan Litigation* .......................................... 142

III. *DISCUSSION* ............................................... 142
 A. *Summary Judgment Standard* .................................... 142
 B. *Background and Relevant Provisions of the OWBPA* ................... 143
 C. *Bull's Motion for Summary Judgment Against the Commonwealth*
 *and the EEOC* .............................................. 143
 1. *Summary* ............................................... 143
 2. *Releases Signed more than 300 Days Before This Court's Consid-*
 *eration of the Parties' Summary Judgment Claims* ................. 144
 D. *The Lawfulness of Bull's Releases* .................................. 145
 1. *Releases used from July 1994 to June 1996* .......................... 146
 a. *Failure to comply with statutory information requirements* ...... 146
 b. *Other shortcomings of the 1994 Releases* ........................ 147
 c. *Conclusion* ........................................... 148
 2. *Releases used from July 1996 to January 1998* ...................... 148
 3. *Releases used from January 1998 to the present* .................... 148
 a. *The revised 1998 information packet* ............................ 149
 b. *The 1998 benefits package* .................................. *150*
 c. *Conclusion* ............................................. 151
 E. *The Commonwealth and the EEOC's Claims for Relief* ................... 151
 1. *Declaratory Relief* .......................................... 151
 2. *Provision of Information* ...................................... 151
 3. *Statute of Limitations Issues* .................................. 152
 a. *Triggering the ADEA's Statute of Limitations—Background*
 *Case Law* ............................................. 152
 b. *What Each Employee Knew: The Import of American Air-*
 *lines* ................................................ 154
 c. *What Bull Did to Mislead: The Doctrine of Equitable Tolling* ..... 156
 d. *Conclusion* ........................................... 156
 F. *Bull's Motion for Summary Judgment Against Madigan* .................. 156
 1. *Counts I and II: Violation of OWBPA* ............................ 157
 2. *Count III & age-based portions of Count VII: Violation of the*
 *ADEA, 29 U.S.C. § 623(a), and M.G.L. c. 151B § 4* .................. 157
 a. *Whether OWPA violations themselves comprise cause of*
 *action under ADEA* ...................................... 157
 b. *Exhaustion of administrative remedies* .......................... 158
 3. *Count IV: Violation of the ADA, 42 U.S.C. § 12112* .................... 159
 4. *Count VI: Violation of ERISA* .................................. 160
 5. *Count VII: Violation of M.G.L. 151B, § 4* .......................... 161

IV. *CONCLUSION* .............................................. 162

## I. INTRODUCTION

This action involves allegations of unlawful employment discrimination by Bull HN Information Systems, Inc. ("Bull"). The Commonwealth of Massachusetts ("Commonwealth") and the United States Equal Employment Opportunity Commission ("EEOC") allege that General Release and Severance Agreements ("Releases") used by defendant Bull from July 1994 through the present in connection with a series of reductions in workforce ("RIFs") violate the Older Workers Benefits Protection Act

("OWBPA")[1] and the Age Discrimination in Employment Act ("ADEA").[2] The EEOC also alleges violations of the Fair Labor Standards Act ("FLSA").[3]

The individual plaintiff in this case, Robert F. Madigan ("Madigan"), is a former Bull employee who signed a Release in 1994. Madigan claims the Release he signed violates the OWBPA and the ADEA. He also claims employment discrimination in violation of the Americans with Disabilities Act ("ADA"),[4] the Civil Rights Act of 1991,[5] and M.G.L. Ch. 151B, as well as violation of the Employee Retirement Income Security Act of 1974 ("ERISA").[6]

Bull moves for summary judgment of all claims brought by the three plaintiffs. Both the Commonwealth and the EEOC move for summary judgment against Bull. Madigan does not seek summary judgment.

### A. *The Commonwealth and the EEOC's Claims*

For the reasons discussed below, Bull's Motion for Summary Judgment against the Commonwealth and the EEOC [docket entry # 54] is hereby **GRANTED in part and DENIED in part.** The Motion is **GRANTED** with respect to the EEOC's FLSA claim. The Motion is **DENIED** with respect to the plaintiffs' OWBPA and ADEA claims. The Commonwealth and the EEOC's Motions for Summary Judgment against Bull [docket entries # 62 and # 66] are **GRANTED in part and DE-**

NIED in part. The Commonwealth and the EEOC are entitled to judgment as a matter of law on their allegations regarding the unlawfulness of Releases used by Bull from July 1994—December 1997. Their motion is **DENIED** with respect to the Releases used in 1998, 1999, and 2000.

As noted below, this Memorandum and Order resolves all questions of law related to the validity of the 1994—1997 Releases. The plaintiffs' legal claims regarding the lawfulness of the 1998—2000 Releases remain active. In addition, most questions of remedy remain unresolved.

### B. *Madigan's Claims*

For the reasons discussed below, Bull's Motion for Summary Judgment against Madigan [docket entry # 58] is **GRANTED in part and DENIED in part.** Bull is entitled to judgment as a matter of law on Madigan's age-related and ERISA claims. This resolves Count III, Count VI, and the age-related portions of Count VII in Madigan's Complaint. Count V was dismissed in an earlier ruling. Additionally, the findings detailed here with respect to the Commonwealth and the EEOC's claims resolve Madigan's Counts I and II.

Thus, of Madigan's various claims, only Count IV and the non-age-related portions of Count VII remain unresolved.

## II. *BACKGROUND*[7]

Bull is an advanced technology company based in Billerica, Massachusetts. As of

1. 29 U.S.C. § 626.

2. *Id.* § 621 et seq.

3. *Id.* §§ 211, 215(a)(5).

4. 42 U.S.C. § 12101 et seq.

5. Pub.L. No. 102–166, 105 Stat. 1071 (1991) (codified as amended in scattered sections of 29 and 42 U.S.C.). Madigan includes in his claim violations of that portion of the Civil Rights Act of 1991 that amends Title VII of the Civil Rights Act of 1964.

6. 29 U.S.C. § 1001 et seq.

7. For additional background, see this Court's earlier decision in this case, *Commonwealth of Mass. v. Bull HN Info. Sys., Inc.,* 16

December 1988, Bull employed approximately 4,500 people in Massachusetts. Since then, Bull has reduced its workforce in the state by more than 3,000 employees.

## A. Age–Discrimination Allegations, 1990—1994

Beginning in 1990, many former Bull employees, laid off pursuant to the company's workforce reduction program, filed age-discrimination complaints with the EEOC and the Massachusetts Commission Against Discrimination ("MCAD"). In 1993, the Massachusetts Attorney General initiated an investigation into Bull's employment practices, and in July of that year, the Commonwealth informed Bull that it intended to file an age discrimination complaint against the company. On July 25, 1994, the Attorney General intervened in a complaint filed against Bull with the MCAD. The complaint alleged that Bull was engaged in a pattern and practice of age discrimination, and that older employees had been disproportionately affected by Bull's layoffs between 1990 and 1994.

## B. Bull's Severance Pay Plan and Releases, 1994—1998

Prior to the Attorney General's investigation, Bull's severance-pay plan offered laid-off employees one week of base pay per year of service.[8] Bull revised this severance plan effective July 5, 1994, approximately one year after the Attorney General notified Bull that it had begun to investigate Bull's employment practices.[9] Under the new plan, Bull continued to offer one week of base pay per year of service, but the company added a new condition: It required terminated employees to sign a waiver of rights, explicitly including ADEA rights, before receiving any severance pay.

The Releases added in 1994 provided, "[i]n full consideration and exchange for ... severance payments," an employee "agree[s] to give up and release forever" her ability to sue Bull for any claims "arising out of [her] employment with Bull." Under this severance plan, therefore, any employee who executes a Release but later brings or maintains any claim covered by the agreement is required to return all severance pay, and to indemnify Bull for all attorneys fees, costs, and expenses associated with defending the claim.

In July 1994, Bull laid off more than fifty employees pursuant to an "employment termination program," as that term is used in the OWBPA.[10] Affected individ-

---

F.Supp.2d 90 (D.Mass.1998) [hereinafter "Bull I"].

8. This offer was subject to various eligibility requirements, including a minimum length of service.

9. Bull indicates that it first began to review its severance-pay plan in mid–1993, at least two months *before* the Attorney General notified Bull of the investigation, which suggests that Bull began to consider revising the company's severance plan prior to the commencement of the Attorney General's investigation. This sequence of events, however, neither proves nor disproves a causal relationship between the investigation and the actual revision of the severance plan, which became effective after the investigation started.

10. 29 U.S.C. § 626(f)(1)(F)(ii), (H).

In its response to the Commonwealth's Complaint, Bull indicates that as of 1994, the company did not believe its July 1994 involuntary RIF constituted an "employment termination program" under the OWBPA, because the RIF included no voluntary or opt-out aspect. While the statutory text of the OWBPA does not define " 'exit termination program or other employment termination program,' the legislative history states that an exit termination plan can be either voluntary or involuntary." *Blackwell v. Cole Taylor Bank*, 1997 WL 688880, *4 (N.D.Ill.1997) (citing S.Rep. No. 101–263, at 32 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1509, 1537–38); *accord American Airlines, Inc. v. Cardoza–Rodriguez*, 133 F.3d 111, 118 n. 5 (1st Cir.

uals were required to sign the new Releases.

In May 1996, the Massachusetts Attorney General filed a complaint with the EEOC. The complaint alleged that Bull's 1994 Releases violate the OWBPA, a statute which details various conditions that must be met in order for an employee's waiver of her age-discrimination claims to be adjudged valid.[11] The EEOC found reasonable grounds to believe this allegation and attempted to conciliate the matter in accordance with the requirements of the OWBPA.[12] Ultimately, however, conciliation was unsuccessful. The EEOC therefore forwarded the case to its regional attorney for possible litigation. In addition, at the Attorney General's request, the EEOC sent the Commonwealth a "notice of right to sue." The notice indicated that the EEOC was continuing to handle the claim, but the Commonwealth could also file an ADEA suit if it so desired.

In the meantime, from 1994 to the present, Bull conducted various voluntary and involuntary RIFs. All affected employees were required to sign Releases, though Bull revised the text and format of the Releases on several occasions. Specifical-

ly, in 1995 and the first six months of 1996, the company used Releases essentially identical to those used in 1994. In early July 1996, the company amended the Releases slightly. The updated 1996 Release allowed involuntarily terminated employees a longer review period (forty-five days, in place of the twenty-one-day review period formerly provided to those employees), and it expanded the range of statistical information provided to all laid-off employees.

Bull again amended its Releases in 1998, slightly increasing the compensation package offered to affected employees, and reformatting and expanding the information package provided to those employees. Since 1998, Bull has made only minor changes in its Releases.

### C. *The Instant Litigation*

The Commonwealth filed this action on June 12, 1997, challenging all of the Releases used by Bull since 1994. The Commonwealth's complaint alleges five counts under the ADEA and OWBPA,[13] and requests declaratory, equitable, and injunctive relief.[14]

1998) (discussing the same legislative history).

11. For example, the OWBPA provides that a waiver "may not be considered knowing and voluntary unless ... the waiver specifically refers to rights or claims arising under [the ADEA]," and "the individual [signing the waiver] is advised in writing to consult with an attorney prior to executing the agreement." 29 U.S.C. § 626(f)(1)(B), (E).

12. *Id.* § 626(b).

13. The five counts in the Commonwealth's complaint are:
 1. Violation of OWBPA Section 626(f)(4): Chilling effect on filing of complaint or claim;
 2. Violation of OWBPA Section 626(f)(1)(F)(ii) and (f)(1)(H): Failure to comply with reporting requirement, and

failure to provide required 45–day period to consider waivers;
 3. Violation of OWBPA Section 626(f)(1)(D)(ii): Failure to provide additional consideration;
 4. Violation of ADEA Section 623(a): Unlawful employment practices; and
 5. Violation of ADEA Section 623(d): Retaliation.

14. Specifically, the Commonwealth requests that the Court (1) declare Bull's Releases invalid and unenforceable; (2) order Bull to inform those age-protected employees who signed Releases that the Releases were invalid, and therefore that the employees may now bring age-related claims in the MCAD or EEOC (or alternatively, that the employees may re-negotiate waivers with Bull); (3) order Bull to re-offer (modified) severance packages to age-protected employees who original-

Also on June 12, 1997, the EEOC filed a separate lawsuit against Bull, on largely the same grounds, seeking largely the same relief.[15] The Commonwealth and the EEOC's actions were consolidated on January 13, 1999.

### D. The Madigan Litigation

The third plaintiff in this case, Madigan, is a former Bull employee who signed Bull's controversial 1994 Release prior to his termination in October 1994. Madigan filed suit against Bull on October 31, 1997. He alleges seven causes of action arising from his employment relationship with and termination by Bull.[16] Madigan's claims were consolidated with those of the Commonwealth and the EEOC on January 21, 1999.

### III. DISCUSSION

This Memorandum resolves four summary judgment motions: Bull's Motion for Summary Judgment against the Commonwealth and the EEOC, the Commonwealth's Motion for Summary Judgment against Bull, the EEOC's Motion for Summary Judgment against Bull, and finally, Bull's Motion for Summary Judgment against Madigan. Given the wide assortment of issues I must address, a short outline is necessary. I first describe the summary judgment standard, and the history and relevant content of the OWBPA. I then evaluate Bull's threshold argument

concerning the timeliness of some of the Commonwealth and the EEOC's claims. Next, I consider the lawfulness of Bull's various Releases, in temporal order. I then address the Commonwealth and the EEOC's various claims for relief. Finally, I turn to Bull's Motion for Summary Judgment against Madigan.

### A. Summary Judgment Standard

Summary judgment is only proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In this context, " 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant." *Grant's Dairy—Maine, LLC v. Commissioner of Maine Dep't of Agric., Food & Rural Res.*, 232 F.3d 8, 13 (1st Cir.2000). Similarly, "genuine" means that the evidence about the fact is sufficient to permit a reasonable jury to "resolve the point in favor of the nonmoving party." *Id.*

In ruling on a summary judgment motion, I must view "the facts in the light most favorable to the non-moving party." *Rodriguez–Cuervos v. Wal–Mart Stores, Inc.*, 181 F.3d 15, 19 (1st Cir.1999). Over-

---

ly refused to sign the waiver; (4) declare that Bull may not raise timeliness or statute-of-limitations defenses to future age-discrimination charges filed with the EEOC or MCAD; and (5) order Bull to cease enforcing existing Releases.

**15.** The EEOC's Complaint does not itemize causes of action but alleges violation of ADEA Section 623(a)(1), (a)(2), and (d), OWBPA Section 626(f)(1), and FLSA.

**16.** Madigan alleges:

1. Violation of OWBPA Section 626(f)(1)(F)(ii), (H)(i) and (H)(ii);
2. Violation of OWBPA Section 626(f)(1)(D);
3. Violation of ADEA Section 623(a);
4. Violation of ADA Section 12112;
5. Violation of Title VII, 42 U.S.C. § 2000e (this cause of action was dismissed by order of this Court dated April 12, 1999);
6. Violation of ERISA; and
7. Violation of M.G.L. Chapter 151B Section 4.

all, therefore, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Where the non-moving party bears the burden of proof on an issue at trial, the moving party need not produce evidence undermining the non-moving party's case. Instead, the moving party may simply point out to the court the "absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. The question, therefore, is not whether there is absolutely no evidence supporting the non-movant, but " 'whether there is any upon which a jury could properly proceed to find a verdict in that party's favor.' " *Caputo v. Boston Edison Co.,* 924 F.2d 11, 13 (1st Cir.1991) (citing *De Arteaga v. Pall Ultrafine Filtration Corp.,* 862 F.2d 940, 941 (1st Cir.1988)).

## B. *Background and Relevant Provisions of the OWBPA*

Courts have long agreed that an employee's waiver of her ADEA-rights is only judicially enforceable if the waiver was executed "knowing[ly] and voluntar[ily]." [17] Prior to 1990, however, courts disagreed as to the appropriate standard for determining whether a waiver of rights was "knowing and voluntary." [18]

The 1990 passage of the OWBPA [19] resolved these disagreements. The OWBPA was enacted to "ensure[ ] that older workers are not coerced or manipulated into waiving their rights to seek legal relief under the ADEA." S.Rep. No. 101–263, at 5 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1509, 1510. It mandates that "a waiver [of ADEA rights or claims] may not be considered knowing and voluntary unless at a minimum" various specific conditions are met. 29 U.S.C. § 626(f)(1).

Of most relevance to this case, the OWBPA's specific requirements include: (1) an employee may only "waive[ ADEA] rights . . . in exchange for consideration in addition to anything of value to which [she] already is entitled," *id.* § 626(f)(1)(D); (2) an employer must allow employees subject to an "employment termination program" at least forty-five days to consider whether to execute a waiver, *id.* § 626(f)(1)(F)(ii); and (3) the employer must provide the employees subject to such a program with certain specific information about the program, *id.* § 626(f)(1)(H). Further, the OWBPA indicates that a waiver may not "be used to justify interfering with the protected right of an employee to file a charge or participate in an investigation or proceeding conducted by the [EEOC]." *Id.* § 626(f)(4). While the statute provides that violations of any of these statutory requirements renders an employee's waiver of her ADEA rights or claims unenforceable, however, it does not mention other relief (such as equitable modification of a statute of limitations).

## C. *Bull's Motion for Summary Judgment Against the Commonwealth and the EEOC*

### 1. *Summary*

Bull makes several arguments in support of summary judgment. First, the

---

17. *American Airlines,* 133 F.3d at 117 (discussing the history of the OWBPA).

18. *Id.*

19. The Older Workers Benefits Protection Act, Pub.L. No. 101–433, 29 U.S.C. § 626(f) (1990).

company reasserts two claims this Court has already addressed: (1) the Commonwealth and the EEOC lack standing to pursue the claims alleged in their Complaints; and (2) no independent cause of action exists under the OWBPA. As Bull acknowledges in its Motion for Summary Judgment against the Commonwealth and the EEOC, this Court ruled against the company on both of these arguments in an earlier decision in this case. *Bull I*, 16 F.Supp.2d at 96—104, 105—110. I decline to revisit these issues here.[20]

With respect to Releases signed more than 300 days prior to this Court's consideration of the parties' summary judgment claims, Bull argues that it is entitled to summary judgment regardless of the lawfulness of the Releases, because the ADEA's 300–day statute of limitations[21] has lapsed for any claims that have not yet been brought by individual former employees. Alternatively, Bull maintains that it is at least entitled to summary judgment with respect to Releases signed more than 300 days ago in those cases in which individuals were provided with age data about the employee termination program at the time the Releases were signed.[22] Finally, with respect to Releases signed after Jan-

uary 29, 1998, Bull contends it is entitled to summary judgment on all counts because those Releases fully comply with the terms of the OWBPA.

This Section addresses Bull's statute of limitations arguments.[23] I address Bull's contention regarding the 1998, 1999, and 2000 Releases below, in the context of evaluating the lawfulness of all challenged Releases.

2. *Releases Signed more than 300 Days Before This Court's Consideration of the Parties' Summary Judgment Claims*

The ADEA bars any "individual" from filing suit more than 300 days "after the alleged unlawful practice occurred." 29 U.S.C. §§ 626(d)(2), 633(b). Based on this provision, Bull maintains this Court should grant summary judgment in Bull's favor on all claims relating to Releases signed more than 300 days prior to this Court's consideration of the issues in the case.

This argument apparently stems from Bull's belief either (1) that the ADEA's statute of limitations directly bars the Commonwealth and the EEOC's claims, or (2) that the statute of limitations indirectly

20. Bull has raised the question of whether an independent cause of action exists for violations of the OWBPA in connection with the EEOC's and the Commonwealth's actions for declaratory relief. Bull also challenges the claim of the individual employee, Madigan, for damages for violations of the OWBPA. That raises a different issue, which I address *infra*.

21. 29 U.S.C. §§ 626(d)(2), 633(b).

22. This alternative argument reflects Bull's understanding that the ADEA's statute of limitations begins to run only when affected employees "ha[ve] sufficient information to bring their discrimination claims." *American Airlines*, 133 F.3d at 123. Bull apparently recognizes that there is some question whether

employees subject to involuntary RIFs between July 1994 and June 1996, none of whom received any data about the RIFs, had sufficient information to trigger the statute of limitations.

23. I briefly dispense here with the EEOC's allegation that Bull's RIFs violate FLSA. Other than the EEOC's Complaint, none of the filings in this case seemingly mentions FLSA. Thus, the record before this Court does not support an FLSA cause of action. I therefore find that the EEOC has "fail[ed] to make a showing sufficient to establish the existence of ... [its FLSA claim,] ... on which [it] will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. Accordingly, Bull's Motion for Summary Judgment is hereby GRANTED with respect to the FLSA claim.

bars relief to the Commonwealth and the EEOC unless individual, former Bull employees could benefit directly from that relief. I am not persuaded by either line of reasoning.

■ First, with respect to direct application of the ADEA's deadlines to the Commonwealth and the EEOC, the language of the statute of limitations explicitly limits the reach of the provision to "civil action[s] ... commenced by an *individual.*" 29 U.S.C. § 626(d) (emphasis added). It is improbable, to say the least, that Congress intended to subsume states and federal regulatory agencies within the term "individual." Further, applying the Act's 300-day statute of limitations directly to the EEOC would contravene the ADEA's specific requirement that the EEOC "attempt to eliminate the discriminatory practice or practices alleged, and to effect voluntary compliance with the requirements of this chapter *through informal methods of conciliation, conference, and persuasion.*" *Id.* (emphasis added).[24] I therefore do not interpret the ADEA's statute of limitations to apply directly to states or federal agencies.

This reading, in turn, influences my finding with respect to indirect application of the ADEA's statute of limitations to the Commonwealth and the EEOC: Having refused to apply the statute of limitations directly to either party, I am not inclined to permit Bull to achieve the same illogical result indirectly, by invoking hypothetical,

potentially-barred lawsuits by former Bull employees. As discussed in *Bull I*, the Commonwealth (and, by extension, the EEOC) brought this action to vindicate interests "above and apart from the interests of the individuals who ... signed" the allegedly "unlawful Releases." *Bull I*, 16 F.Supp.2d at 98; *cf. Occidental Life Ins.*, 432 U.S. at 368, 97 S.Ct. 2447 (noting, with respect to Title VII enforcement actions, "the EEOC does not function simply as a vehicle for conducting litigation on behalf of private parties"). For example, the Commonwealth has an interest in "protect[ing] its residents' participation in the federal age discrimination scheme." *Bull I*, 16 F.Supp.2d at 98. Similarly, the EEOC has a cognizable interest in monitoring employers' compliance with that scheme. Therefore, even assuming (as Bull claims) that the ADEA's statute of limitations bars suits by former Bull employees who signed Releases more than 300 days prior to this Court's evaluation of the case, it simply does not follow that this bar also acts, indirectly, to prevent the Commonwealth and the EEOC from vindicating their distinct interests. Accordingly, Bull's Motion for Summary Judgment against the EEOC and the Commonwealth is **DENIED** as to all waivers signed before January 29, 1998.[25]

### D. *The Lawfulness of Bull's Releases*

I turn now to the central issue in this case: The validity of the Releases used by

---

**24.** Accord *Occidental Life Ins. Co. of Cal. v. EEOC*, 432 U.S. 355, 368, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977) (noting, in the context of Title VII, that in contrast to "the typical litigant against whom a statute of limitations might appropriately run, the EEOC is required by law to refrain from commencing a civil action until it has discharged its administrative duties [including conciliation]"); *cf.* H.R.Rep. No. 102–40(I), at 96 (1991) *reprinted in* 1991 U.S.C.C.A.N. 549, 634 (noting that

due to "the similarities between the statutes, the courts have routinely looked to Title VII precedents in interpreting corresponding provisions of the ADEA").

**25.** As noted earlier, I address Bull's claims regarding the lawfulness of the 1998, 1999, and 2000 waivers below, in the context of evaluating the Commonwealth and the EEOC's Motions for Summary Judgment.

Bull from 1994 to the present.[26] To evaluate this issue, I must consider the various counts in the plaintiffs' Complaints, as applied to each set of Releases.

### 1. Releases used from July 1994 to June 1996

The Commonwealth and the EEOC present several strong arguments in support of their contention that the severance packages and litigation waivers used by Bull from July 1994 to June 1996 ("the 1994 Releases") violate the OWBPA and the ADEA.[27] Consideration of one of these arguments—the paucity of statistical information provided to laid-off employees—is sufficient to support the plaintiffs' claim that all of Bull's 1994 Releases are unlawful, and hence invalid. Evaluation of two of the plaintiffs' other arguments confirms this conclusion. I need not reach the plaintiffs' remaining claims.

### a. Failure to comply with statutory information requirements

As noted earlier, the OWBPA explicitly provides that waivers of ADEA rights or claims signed by employees subject to an employment termination program "may not be considered knowing and voluntary"—and, consequently, enforceable—unless the employees receive sufficient information about the program. 29 U.S.C. § 626(f)(1)(H). Specifically, the employer must inform the affected employee about the "class, unit, or group of individuals covered by [the] program, any eligibility factors for such program, and any time limits applicable to such program," *id.* § 626(f)(1)(H)(i), as well as "the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program," *id.* § 626(f)(1)(H)(ii). Further, the employer must provide the information "in writing *in a manner calculated to be understood by the average individual eligible to participate.*" *Id.* § 626(f)(1)(H) (emphasis added).

The purpose of these provisions is clear. They are intended to "permit older workers," who might otherwise "have no information at all regarding the scope of the [employment termination] program or its eligibility criteria[,] ... to determine whether the program gives rise to a valid claim under the ADEA." S.Rep. No. 101–263, at 32 (1990), *reprinted in part in* 1990 U.S.C.C.A.N. 1509, 1537–38.

■ The information Bull provided to employees subject to RIFs between July 1994 and June 1996 violates both the letter and the spirit of these statutory requirements. To begin with, employees subject to involuntary RIFs received absolutely no information about the other individuals affected by the termination programs; they were left entirely in the dark as to whether the programs "[gave] rise to a valid claim under the ADEA." *Id.*

Employees subject to voluntary RIFs received some statistical information about the programs, but the information was inadequate to alert affected employees to potential age-discrimination claims. The standard outlined in the OWBPA—"calculated to be understood by the average

---

**26.** All four of the motions for summary judgment submitted in this case raise this issue in some form, with respect to some set of Releases.

**27.** As noted above, Bull's Motion for Summary Judgment with respect to the 1994 and

1996 Releases does not rely on the validity of those Releases, but instead on the ADEA's statute of limitations, which suggests that Bull itself recognizes that the validity of the 1994 and 1996 Releases is at least contestable as a matter of fact.

individual eligible to participate" in the RIFs, 29 U.S.C. § 626(f)(1)(H)—was not followed. Instead, voluntarily terminated employees received only abstruse spreadsheets detailing the "work units" involved in the RIF,[28] the job titles and ages (in ten-year age bands) of eligible and ineligible employees, and the total numbers of eligible and ineligible employees in each work unit. It is conceivable that an affected employee could somehow discover a valid ADEA claim hidden in these columns of numbers, but not without the help of a statistician. Further, the spreadsheets do not provide any information about "eligibility factors." [29] *Id.* § 626(f)(1)(H)(i). Thus, the data provided to employees subject to RIFs during this two-year period were entirely inadequate to comply with either the intent or the plain meaning of the OWBPA's information requirements.

### b. *Other shortcomings of the 1994 Releases*

■ In addition to the informational deficiencies of the 1994 Releases, several other defects provide independent grounds for holding these Releases invalid. For example, employees subject to involuntary RIFs did not receive the statutorily re-quired forty-five-day consideration period. As noted above,[30] as of 1994, Bull did not understand the OWBPA's provisions regarding "employment termination program[s]" to apply to *involuntary* layoffs. The company therefore interpreted the OWBPA to require only a twenty-one-day consideration period for involuntarily laid-off employees.[31]

The statute makes no such distinction. And, to the extent it is ambiguous on this issue at all, the legislative history of the OWBPA makes clear that the term "employment termination program" was intended to cover both voluntary and involuntary group layoffs. S.Rep. No. 101–263, at 32 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1509, 1537–38. Thus, the 1994 Releases used by Bull in connection with involuntary RIFs cannot be considered "knowing and voluntary" because employees were given only twenty-one days to consider whether to waive their ADEA rights and claims.[32]

■ Further, the 1994 Releases expressly interfere with employees' rights to file charges with the EEOC and to participate in EEOC proceedings or investigations. Bull's 1994 Releases purport to pro-

---

**28.** For example, the sample 1994 information sheet that Bull provided this Court is titled, obscurely, "Summary of Eligible Employees by Age Grouping (CSO, CAS, Workflow/Imaging Organizations)."

**29.** Bull argues that the information provided in its Severance Pay Plan regarding employees' eligibility to receive severance pay (such as the provision denying such pay to "[e]mployees classified as other than 'regular' employees," 1994 Severance Pay Plan at ¶ 1) satisfies the OWBPA's requirement that laid-off individuals be informed of "eligibility factors" for employment termination programs. 29 U.S.C. § 626(f)(1)(H)(i).

Bull's reading of the term "eligibility factors" would debase the OWBPA. The intent of the statute's information requirement is to

alert affected employees to potential age-discrimination claims. Clearly, therefore, the term "eligibility factors" must refer to the factors used to determine who is subject to a termination program, not the factors used to determine who is eligible for severance pay after termination.

**30.** *Supra* note *10.*

**31.** The 21–day requirement comes from an adjacent provision of the OWBPA, 29 U.S.C. § 626(f)(1)(F)(i).

**32.** The Commonwealth and the EEOC do not suggest that the Releases used in connection with voluntary RIFs violate this provision of the OWBPA, as employees subject to voluntary RIFs were given 45 days to consider the waiver agreement prior to signing.

scribe a laid-off employee from "SU[ING] BULL FOR ANY CURRENT OR PRIOR CLAIMS ARISING OUT OF HIS/HER EMPLOYMENT WITH OR TERMINATION FROM BULL," [33] or "bringing or maintaining any complaints or claims," including ADEA claims. 1994 General Release and Severance Agreement at ¶¶ 3, 4 (emphasis in original). This broadly-worded prohibition, which extends beyond judicial actions to encompass all "claims," flies in the face of the OWBPA's clear proscription of any interference with an employee's right to instigate or participate in "an investigation or proceeding conducted by the Commission." 29 U.S.C. § 626(f)(4); cf. American Airlines, 133 F.3d at 118 n. 7.[34] Under the circumstances, therefore, the 1994 Releases cannot be considered "knowing and voluntary."

#### c. *Conclusion*

Thus, I find no genuine issue of material fact regarding the lawfulness of the 1994 Releases. The Releases are invalid, because laid-off employees did not execute the ADEA-waivers knowingly and voluntarily, within the meaning of the OWBPA. Accordingly, the Commonwealth and the EEOC's Motions for Summary Judgment are hereby **GRANTED** with respect to the invalidity of these waivers.

This holding does not, however, extend to the Commonwealth and the EEOC's requests for equitable relief. All questions of relief are addressed below.

#### 2. *Releases used from July 1996 to January 1998*

On or about July 1, 1996, Bull amended its Releases and corrected some of the OWBPA violations. In particular, the company improved the statistical package provided to individuals subject to voluntary RIFs, provided the same package to individuals subject to involuntary RIFs, and allowed all affected employees forty-five days to consider the Releases.[35] Bull used these new Releases ("the 1996 Releases") until late January 1998.

Bull's 1996 updates to its Releases correct most of the deficiencies of the 1994 version, but the 1996 Releases still interfere with employees' ability to "bring[ ] or maintain[ ] any complaints or claims," explicitly including "claims or rights under . . . the [ADEA]." 1996 General Release and Severance Agreement at ¶ 3. As discussed above, this provision clearly violates the OWBPA's strict protection of an employee's right to instigate or participate in an EEOC proceeding. 29 U.S.C. § 626(f)(4). Thus, I find that like the 1994 Releases, Bull's 1996 Releases cannot be considered "knowing and voluntary." [36] Summary judgment is hereby **GRANTED** in favor of the Commonwealth and the EEOC with respect to the invalidity of the 1996 waivers.

#### 3. *Releases used from January 1998 to the present*

On or about January 29, 1998, Bull again amended its Releases. Among other

---

**33.** In its deposition of Bull attorney Kurt R. Thelen, the EEOC asked Mr. Thelen whether the term "claims" in "the last paragraph of the [1994] General Release of Claims, paragraph 3," included claims filed with MCAD or the EEOC. Mr. Thelen answered affirmatively. Thelen Dep. at 162.

**34.** And in Bull's case, an EEOC investigation was not an abstraction. By 1993 the EEOC *was* investigating the company.

**35.** As noted earlier, the 1994 Releases already provided individuals subject to voluntary RIFs with a forty-five day review period.

**36.** This finding is sufficient to hold Bull's 1996 Releases invalid as a matter of law, so I need not now evaluate the "information packets" provided in connection with the 1996 Releases.

changes, the company increased by $100 the compensation provided to eligible individuals who executed a release,[37] removed the indemnification and confidentiality provisions, and the covenant not to sue, and added a clause preserving an employee's right to "fil[e], cooperat[e] with, or partic-ipat[e] in an age discrimination proceeding before a state or federal Fair Employment Practices Agency" (though not to "recover any monetary benefits in such proceeding"). 1998 General Release and Severance Agreement at ¶¶ 2, 3. These amended Releases ("the 1998 Releases") remained in effect, with no substantive changes, through at least September 2000.

The 1998 amendments largely cure the legal deficiencies of Bull's 1994 and 1996 Releases. Nevertheless, at least two questions remain: First, do the revised "information packets" satisfy the OWBPA's stringent requirements; and second, does the new benefits package constitute sufficient consideration for an employee's agreement to waive all ADEA rights? For the reasons discussed below, I cannot answer either question as a matter of law.[38]

### a. *The revised 1998 information packet*

■ Compared to the confusing spreadsheets provided to employees laid off between 1994 and 1997, Bull's 1998 information packets are a model of clarity. The 1998 information sheets, entitled "Descrip-

tion of Work Unit and Corresponding Demographic Data," provide four categories of data: (1) The name of the employee subject to the RIF; (2) the names of the affected "Organization" and "Work Unit" within Bull; (3) the titles and ages of all employees in the work unit who are affected by the RIF; and (4) the titles and ages of all employees in the work unit who are not affected by the RIF. Further, the information is provided in a format that seems quite likely to be "understood by the average individual eligible to participate." 29 U.S.C. § 626(f)(1)(H). Therefore, I cannot find as a matter of law that these 1998 information packets violate the OWBPA's information requirements.

On the other hand, the record before me does not · support summary judgment in favor of Bull regarding the sufficiency of the 1998 information packets. Significant factual questions remain unanswered. For example, viewed in the light most favorable to the plaintiffs, the record does not clearly establish whether Bull's successive RIFs in 1998, 1999, and 2000 formed part of a single "employment termination program" (in which case the company should have provided affected employees with cumulative information about the RIFs) or whether each RIF was instead an independent "employment termination program" (in which case no cumulative information was necessary).

---

**37.** As indicated earlier, prior to this change, employees who executed a Release received one week of pay per full year of service.

**38.** The Commonwealth also suggests that the 1998 Releases unlawfully interfere with an employee's right to participate in an EEOC proceeding, by requiring an employee to acknowledge that she "may not recover any monetary benefits in such proceeding." 1998 General Release and Severance Agreement at ¶ 3.

I am reluctant to discuss this issue at any length on summary judgment, as it turns on the overall validity of the 1998 Releases, which cannot be determined as a matter of law. That is, if the Releases are otherwise valid, then the statement that execution of a Release shields Bull from having to pay monetary damages is simply true. On the other hand, if the Releases are otherwise invalid, then the same statement is misleading and may, in fact, unlawfully inhibit an employee from filing a claim with the EEOC.

Further, I have some doubt about Bull's explanation of the factors used to determine "eligibility" for the 1998—2000 RIFs: Bull maintains that the company satisfied the OWBPA's "eligibility factors" requirement by providing all employees with information about their "eligibility" for the company's Severance Pay Plan. As discussed above, this argument involves an untenable reading of the OWBPA.[39] On the other hand, the plaintiffs have not provided me with any evidence clearly indicating that Bull actually employed program-wide eligibility factors in selecting which employees to terminate in 1998, 1999, and 2000.

Thus, genuine factual issues remain unresolved regarding the legal sufficiency of the information packets that Bull included with the 1998 Releases. I therefore decline to grant summary judgment on this question.

### b. *The 1998 benefits package*

■ Similarly, the record now before me does not support judgment as a matter of law regarding the sufficiency of the benefits package Bull provided as consid-

eration for an employee's execution of a 1998 Release.

As plaintiffs note, employees who executed Bull's 1994 and 1996 Releases received only one week of pay per full year of service to the company—the same benefits package received by employees laid-off before 1994, who were not required to execute waivers.[40] In 1998, Bull added $100 to this compensation package. I cannot determine as a matter of law whether the resulting package—$100 plus one week of pay per year of service—constitutes "consideration in addition to anything of value to which the individual already is entitled," 29 U.S.C. § 626(f)(1)(D).

Among other difficulties, on the record now before me, I cannot determine whether Bull's conduct in connection with its severance-pay plans created an implied contract with employees, under which a terminated employee was *entitled* to receive a week of pay per year of service upon termination, independent of the Release plan. Depending on the answer to this question, a second, relevant factual question concerns the adequacy of $100 as compensation for an employee's relinquishment of potentially valuable ADEA claims.[41]

---

39. *Supra* note 29.

40. The Commonwealth and the EEOC also challenged the legal sufficiency of the benefits package provided to employees who signed Releases between 1994 and 1997. Because I found the 1994 and 1996 Releases invalid for other reasons, I did not reach the question of the benefits package.

41. Bull argues that this Court should not consider the adequacy of the $100 payment that the company made in exchange for an employee's execution of a 1998 Release. In support of this position, Bull invokes the familiar rule of contract law that courts need not be "concerned with the adequacy of the consideration, as long as it is 'valuable.'" *V. & F.W. Filoon Co. v. Whittaker Corp.,* 12 Mass. App.Ct. 932, 425 N.E.2d 399, 400 (1981). Given the structure of the OWBPA, however,

there is a strong argument that "[t]raditional contract principles come into play only after an initial inquiry as to compliance with the statutory provisions." *EEOC v. Johnson & Higgins,* 5 F.Supp.2d 181, 186 (S.D.N.Y. 1998); *cf. Oubre v. Entergy Operations, Inc.,* 522 U.S. 422, 427, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998) (allowing the common law doctrine of ratification to apply in cases involving waivers that violate the OWBPA "would frustrate the statute's practical operation as well as its formal command").

The purpose of the OWBPA is to ensure that an employee's waiver of her age-discrimination claims is truly knowing and voluntary. In light of this purpose, I am unwilling to put a $100 price tag on the OWBPA's requirement of "consideration in addition to anything of value to which the [employee] is already entitled." Instead, I will consider at

These questions cannot be answered as a matter of law. I therefore decline to grant summary judgment to either party on the legal sufficiency of the 1998 benefits packages.

#### c. Conclusion

Numerous factual issues remain unresolved regarding the sufficiency of Bull's 1998 information packets and benefits packages. Thus, I reserve for trial all questions regarding the validity of the 1998 Releases.

#### E. The Commonwealth and the EEOC's Claims for Relief

Having concluded that Bull's 1994 and 1996 Releases violate various OWBPA provisions, I must now evaluate the plaintiffs' claims for relief. The Commonwealth and the EEOC request a broad range of remedies, from a simple declaration that the Releases in question are invalid, to a more far-reaching declaration that Bull cannot raise the ADEA's statute of limitations as a defense to any future age-discrimination suit brought by individual employees who executed Releases between 1994 and 1997.[42] As discussed below, most of the requested forms of equitable relief hinge on factual findings regarding the ADEA's statute of limitations, and they are therefore inappropriate at this stage in the proceedings. Accordingly, I will address these requests for relief at trial.

#### 1. Declaratory Relief

For the reasons discussed above, I find that there are no genuine issues of material fact regarding the invalidity of Bull's 1994 and 1996 Releases (used from July 1994 until January 1998, in connection with several RIFs). Accordingly, I hereby **DECLARE** the ADEA-related portion of those Releases invalid as a matter of law.[43]

#### 2. Provision of Information

One further form of partial relief is appropriate at this time. As discussed above, the information Bull provided to employees who executed the 1994 Releases was entirely inadequate to inform them of potential age-discrimination claims. These employees, therefore, cannot begin to evaluate their current legal position until they are provided with more information about the RIFs conducted by Bull between July 1994 and July 1996. At the very minimum, then, Bull is **ORDERED** to provide all employees subject to voluntary or involuntary RIFs during this two-year period with a copy of this decision.

Ultimately, I also intend to order Bull to provide these employees with all of the information mandated by the OWBPA, in a form "calculated to be understood by the average individual" who participated in those RIFs. 29 U.S.C. § 626(f)(1)(H). I cannot, however, now determine whether this information should be cumulative since that question depends on factual consider-

---

trial, as a question of fact, the adequacy of a $100 payment as compensation for the specific rights Bull asked its employees to waive "knowingly and voluntarily."

42. Of course, the Commonwealth and the EEOC also request the same forms of relief with respect to the 1998 Releases. Consideration of these requests is not appropriate at this time, however, as the validity of the 1998 Releases remains unresolved.

43. Because the Releases include a "Validity" provision, under which "the validity of the remaining parts, terms or provisions" of the Releases is not affected by this declaration, 1994 General Release and Severance Agreement at ¶ 8, I need not address the concern raised by Justice Breyer in *Oubre*, regarding the difference between a "void" contract, and a contract that is merely voidable by the employee. *Oubre*, 522 U.S. at 430—33, 118 S.Ct. 838 (Breyer, J., concurring).

**152**

ations: If Bull's RIFs between July 1994 and July 1996 constituted a single "employment termination program," as the plaintiffs imply, then Bull must provide employees who exercised Releases in that two-year period with information about the entire program. If, on the other hand, each RIF occurred independently of the others, as Bull avers, then Bull need only provide individual employees with information about the particular RIF of which they were a part. I will consider this issue further at trial.

### 3. *Statute of Limitations Issues*

It is clear that under the OWBPA, the Releases I here declare invalid cannot be used to bar a subsequent ADEA claim filed by an individual employee. The plaintiffs, however, want more. They want to ensure that Bull cannot raise the ADEA's 300–day statute of limitations[44] as a defense to any future age-discrimination claims filed by employees who executed invalid Releases.[45]

Plaintiffs' request requires consideration of two distinct questions: (1) Whether the ADEA's limitations period began to run when the employees executed the 1994 and 1996 Releases, and (2) if so, whether the employees are entitled to equitable tolling of that limitations period. I cannot answer these questions here. To do so, I would

have to evaluate both Bull's conduct in arguably misleading its employees as to their rights (a factor relevant to equitable tolling of the limitations period), and individual Bull employees' independent knowledge of their rights, independent of the company's conduct (a factor relevant both to triggering and to tolling the limitations period). As discussed below, the record is too sparse to resolve the former issue on summary judgment, and consideration of the latter is beyond the scope of this case, as Madigan is the only individual plaintiff whose claims are before me.

### a. *Triggering the ADEA's Statute of Limitations—Background Case Law*

■ The First Circuit has held that, as in other employment discrimination actions, the limitations period in ADEA cases begins to run when an employee "'knows that he has been hurt and also knows that his employer has inflicted the injury.'" *American Airlines*, 133 F.3d at 123 (citing *Morris v. Government Development Bank of Puerto Rico*, 27 F.3d 746, 750 (1st Cir.1994) [hereinafter *"Morris"*]). The case law is more ambiguous, however, as to the character and extent of knowledge necessary to meet this standard.

■ In *Morris*, the plaintiff sued his employer, the Government Development

**44.** In a state like Massachusetts, which has a state agency to investigate age-discrimination claims, an aggrieved party must file an ADEA claim with the EEOC within 300 days "after the alleged unlawful practice occurred." 29 U.S.C. § 626(d). If the EEOC subsequently dismisses the charge or otherwise terminates the proceedings, the aggrieved party then has ninety days in which to file a civil action. *Id.* § 626(e).

**45.** For example, the Commonwealth asks the Court to declare that each former Bull employee be entitled to be placed "in the same position as (s)he would have been in had Bull

HN complied with the OWBPA," and to order Bull to re-offer new valid Releases to all affected employees. Declaring the 1994 and 1996 ADEA Releases invalid essentially accomplishes this result: Bull's violation of the OWBPA endows former employees with precisely the same rights they had when they executed the invalid Releases—the rights to contract and to file age-discrimination claims. The only unanswered question is what effect the passage of time (from the signing of a release to the filing of this action, and again from the filing of this action to this decision) has on those rights.

Bank of Puerto Rico, alleging discrimination on the basis of race and political beliefs in connection with the Bank's decision to suspend him from his job as a financial analyst. The district court dismissed the claims as time-barred, because more than a year had passed since Morris was suspended.[46] In upholding the ruling, the First Circuit specifically rejected Morris' assertion that his claim "did not accrue until he knew of *both* the suspension and [his employer's] discriminatory animus." *Morris*, 27 F.3d at 749 (emphasis in original). The court went on to observe that a "plaintiff need not know all the facts that support his claim in order for countdown to commence." *Id.* at 750; *accord American Airlines*, 133 F.3d at 123 (citing *Morris* with approval). Significantly, the *Morris* court then tempered this statement by suggesting that a different outcome might have been appropriate had Morris lacked "sufficient information" at the time of his suspension "to enable him to bring a discrimination claim against the bank." *Morris*, 27 F.3d at 750.

The First Circuit walked a similarly fine line in discussing the ADEA claims at issue in *American Airlines*. That case involved several employees of American Airlines ("American") who executed waivers of their ADEA claims prior to participating in a voluntary early retirement program ("VERP"). When those same employees began to file administrative age-discrimination claims with the Puerto Rico Anti–Discrimination Unit and the EEOC, American filed a complaint in federal district court seeking a declaratory judgment that the waivers were valid. The employees then counterclaimed, alleging violations of the ADEA, the OWBPA, and state law. The court agreed with the employees that the waivers violated the OWBPA.[47] In holding the respondents' ADEA counterclaims time-barred, however, the court indicated that the employees' claims accrued at the time they accepted the VERP, even though American did not replace them with younger workers until a later date. *American Airlines*, 133 F.3d at 123. The court apparently reasoned that since replacement by younger workers is not necessary to a *prima facie* ADEA claim, such replacement cannot be necessary to trigger the ADEA's statute of limitations—even if a terminated employee does not suspect discrimination until the replacement occurs. *Id.*

Again, however, as in *Morris*, the *American Airlines* court then softened the effect of its ruling by reiterating that a cause of action does not accrue at the time of an adverse employment action unless the employee has "sufficient information" to recognize that the adverse action was discriminatory. *Id.* The American employees could not benefit from this qualification, though, because they "knew that the [VERP] was offered only to employees over forty-five years of age" when they agreed to participate in the program. *Id.*

The rule that emerges from these cases is slippery at best. To trigger the ADEA's statute of limitations, an employee clearly must have enough information to "know[ ] or ha[ve] reason to know of the

---

**46.** Morris brought his claims under 42 U.S.C. § 1983. The one-year statute of limitations derives for Puerto Rico's limitations period for personal injury actions. *Morris*, 27 F.3d at 748.

Although Morris' claims did not involve age discrimination, the First Circuit has since cited *Morris* as a "categorical[ ]" statement of the standard for determining when the limita-

tions period begins to run in the employment discrimination context. *American Airlines*, 133 F.3d at 123.

**47.** American's waivers failed to advise employees to consult an attorney before deciding to accept the VERP. *American Airlines*, 133 F.3d at 120.

discriminatory act that underpins his cause of action." *Morris,* 27 F.3d at 749. On the other hand, the employee need not "know all the facts that support his claim." *Id.; accord American Airlines,* 133 F.3d at 123.

In addition, the very existence of the OWBPA suggests a further consideration that must be weighed in determining whether and when the ADEA's statute of limitations was triggered: The complicated and elusive nature of many age-discrimination claims. In enacting the OWBPA's information requirements, Congress specifically recognized that an employee fired as part of an employment termination program may not have sufficient information to determine her rights under the ADEA. S.Rep. No. 101–263, at 32 (1990), *reprinted in part in* 1990 U.S.C.C.A.N. 1509, 1537–38. Clearly, therefore, one cannot reach any conclusion regarding the *ADEA's* statute of limitations in a case involving an employee termination program without considering the employer's compliance with the OWBPA's unique information requirements.

Any conclusion on the statute-of-limitations issue necessarily involves a detailed ad hoc analysis of two questions: (1) What an employee knew or did not know when she executed a Release, and (2) what Bull did or did not do to mislead her,[48] to which I now turn.

### b. *What Each Employee Knew: The Import of American Airlines*

■ Bull suggests the *American Airlines* decision stands for the proposition that very little information is necessary to alert an employee to a potential age claim—and, in turn, to trigger the ADEA's limitations period. The company notes the *American Airlines* court concluded that an "employee has actual knowledge of his rights if he 'learns or is told of his ADEA rights, *even if he becomes only generally aware of the fact there is a statute outlawing age discrimination.'* " *American Airlines,* 133 F.3d at 124 (citing *Kale v. Combined Insurance Co. of Am.,* 861 F.2d 746, 752 (1st Cir.1988)) (emphasis added). Bull further observes that in *American Airlines,* the First Circuit deemed it sufficient that the airline's waivers contained a paragraph explicitly releasing American from liability under the ADEA.

In reliance on this reasoning, Bull points out that its Releases, too, contained a paragraph in which employees released Bull from all liability under the ADEA, and a later paragraph in which employees acknowledged that they had read the "Agreement carefully and underst[ood] all of its provisions." 1994 General Release and Severance Agreement at ¶ 7. Under the *American Airlines* test, Bull argues, these clauses make it difficult for employees to claim they had no knowledge of their ADEA rights at the time they signed the Releases.

I disagree. To begin with, I find the *American Airlines* ruling untenable. The First Circuit essentially concluded that even though the airline's waivers were totally invalid under the OWBPA, the waivers nevertheless conveyed sufficient information to trigger the ADEA's statute of limitations. This holding thus purports to impose two standards on ADEA claims in cases involving waivers: The strict, statutory OWBPA standard, applicable to the waivers themselves, and the common law statute-of-limitations standard, applicable

---

48. In this case, for example, relevant factual questions include the extent of simultaneous press coverage of the Massachusetts Attorney General's investigation of Bull's RIFs. If such coverage was extensive, it may have been sufficient to inform terminated employees of their potential claims, and hence to trigger the ADEA's statute of limitations.

to the underlying ADEA claim. Under this peculiar reasoning, a waiver that entirely fails to satisfy the first statutory standard may nevertheless validly prevent an employee from vindicating her rights under the second standard, simply by dissuading the employee from filing suit for at least 300 days.

The Supreme Court's subsequent decision in *Oubre, supra,* plainly calls into question the *American Airlines* holding. In *Oubre,* the holding was that the contract law doctrine of ratification could not save a release that violates the OWBPA. *Oubre,* 522 U.S. at 427, 118 S.Ct. 838. That is, an employee who receives benefits in exchange for executing an unlawful release need not tender back those benefits prior to filing an age-discrimination claim against her employer, as she would under contract law principles. But the decision's rationale was broader: The Court reasoned that the elaborate requirements of the OWBPA's statutory scheme necessarily trump common law contract principles. To hold otherwise, the Court noted, would "frustrate the [OWBPA's] practical operation as well as its formal command," because

> In many instances a discharged employee likely will have spent the moneys received and will lack the means to tender their return. These realities might *tempt employers to risk noncompliance with the OWBPA's waiver provisions,* knowing it will be difficult to repay the moneys and relying on ratification. We ought not to open the door to an evasion of the statute by this device.

*Id.* (emphasis added).

Although the First Circuit reached a similar decision regarding the ratification doctrine in *American Airlines,* the court somehow failed to recognize that in declaring the airline's waivers invalid under the strict requirements of the OWBPA, but nevertheless holding the employees' counterclaims time-barred, it made precisely the error decried in *Oubre:* It "tempt[ed] employers to risk noncompliance with the OWBPA." *Id.* As the court acknowledged, the statutory violation at issue in *American Airlines*—failure to "advis[e the] employees to consult an attorney prior to electing to retire"—rendered the employees "more likely to face a critical decision without the knowledgeable guidance necessary to assess whether [they are] possibly . . . victim[s] of age discrimination." *American Airlines,* 133 F.3d at 120.

To recognize this flaw but simultaneously find that the American employees' age-discrimination claims accrued at the time they signed the VERP—when they admittedly lacked the guidance necessary to assess their legal position—is to "frustrate the [OWBPA's] practical operation as well as its formal command." *Oubre,* 522 U.S. at 427, 118 S.Ct. 838. Such an outcome clearly permits (indeed, encourages) employers to design unlawful waivers that do not recommend consulting an attorney, or that otherwise mislead employees about their potential age-discrimination claims, in the hopes that after they leave their position, they will be sufficiently confused to sit on their rights until the ADEA's limitations period has expired.

Even assuming *American Airlines* is good law, however, it still does not dictate the outcome in the present case. Whatever the airline's waivers said, the fact is that employees who participated in American's VERP knew at the time "that the program was offered only to employees over forty-five years of age." *American Airlines,* 133 F.3d at 123. As a result, those employees "had sufficient information to bring their discrimination claims." *Id.*

The same is not true here. In this case, there is no evidence that terminated Bull employees were aware of any specific age-

related qualifications for the company's RIFs. Further, at least with respect to Bull's 1994 Releases, the information provided to affected employees was entirely inadequate to apprize them of any such qualifications.[49] Thus, even if the *American Airlines* standard governs this case, it is not clear on this record that individual Bull employees who executed invalid releases had enough information at the time of their termination to trigger the ADEA's statute of limitations.

### c. *What Bull Did to Mislead: The Doctrine of Equitable Tolling*

 Although I cannot now determine whether the ADEA's statute of limitations was triggered at the time Bull employees executed the invalid Releases, I nevertheless turn briefly to the question of equitable tolling, which is available to save an untimely ADEA claim in cases in which the plaintiff "demonstrates 'excusable ignorance' of his statutory rights." *American Airlines*, 133 F.3d at 124 & n. 13.

 The doctrine of equitable tolling is intended to ensure that a defendant is not "permitted to escape liability by engaging in misconduct that prevents the plaintiff from filing his or her claim on time." *Kale*, 861 F.2d at 752 (internal citations omitted). *See* generally, *Ruffino v. State Street Bank and Trust Company*, 908 F.Supp. 1019, 1039 (D.Mass.1995) As such, the doctrine looks, in part, to an employer's actions. If plaintiffs here—or an individual plaintiff in a future action—can produce evidence indicating that Bull knowingly or deliberately withheld critical information about its RIFs from affected employees, equitable tolling might well be appropriate, even though the invalid Releases concededly apprized employees of

the *existence* of the ADEA. That is, Bull cannot be allowed to escape liability simply because it *mentioned* the ADEA in its Releases, if the company actively withheld from affected employees the information necessary for them to recognize their potential claims under the act. *Cf. American Airlines*, 133 F.3d at 124 (noting that American's recruitment of new, younger employees to replace the respondents should have put them on notice of the company's possible violation of the ADEA, and concluding that "[i]n light of these facts, the employees' claim that their 'excusable' ignorance caused them to wait far longer than 300 days to pursue their claims is untenable").

### d. *Conclusion*

In conclusion, I cannot determine as a matter of law whether the ADEA's statute of limitations bars future claims by former Bull employees who executed the 1994 or 1996 Releases. Plainly, the issue of whether *Bull's* conduct triggers the application of equitable tolling requires more factual development. At the same time, the issue of what individual employees knew or did not know surely cannot be resolved on this record at all, with respect to former employees who are not parties to this action.

### F. *Bull's Motion for Summary Judgment Against Madigan*

I turn now to the questions raised in Bull's Motion for Summary Judgment against Madigan. Bull has moved for summary judgment on all claims asserted by Madigan. I consider each claim in turn (noting that this Court previously dismissed Count V of Madigan's Complaint,

---

**49.** As noted earlier, I cannot determine the adequacy of the 1996 or 1998 information packets as a matter of law. The parties should be prepared to pursue these issues at trial.

which raised allegations under Title VII [docket entry # 10, civ. case no. 97–12450] ).

### 1. *Counts I and II: Violation of OWBPA*

Madigan first argues that the Release he executed in connection with his layoff in 1994 violates various provisions of the OWBPA. Because I have already determined that Bull's 1994 Releases violate the OWBPA, I need not consider those Releases further here, nor need I determine whether the OWBPA provides Madigan, as an individual, with a cause of action.[50] Bull's Motion for Summary Judgment of these two Counts is therefore **DENIED.**

### 2. *Count III & age-based portions of Count VII: Violation of the ADEA, 29 U.S.C. § 623(a), and M.G.L. c. 151B § 4*

Madigan also raises various substantive age-discrimination claims under the ADEA itself, and under Massachusetts law. Bull argues that it is entitled to summary judgment of these claims for two reasons. First, with respect to Madigan's claim that Bull's violations of the OWBPA themselves constitute unlawful employment practices within the meaning of 29 U.S.C. § 623(a), Bull again argues that the OWBPA does not itself create a cause of action. Second, with respect to all of Madigan's substantive age-discrimination claims, Bull alleges that Madigan failed to raise these claims in the administrative charges he filed with the MCAD, and therefore that Madigan has failed to exhaust his administrative remedies.

### a. *Whether OWBPA violations themselves comprise cause of action under ADEA*

■ Bull's first argument supporting summary judgment of Madigan's substantive age-discrimination claims essentially restates the company's claim that the OWBPA does not itself create a cause of action under the ADEA. Although I have already considered this argument in the context of all three plaintiffs' requests for declaratory judgment regarding the validity of the various Bull waivers, the context in which Bull now raises the argument, an action for damages is sufficiently different to warrant renewed consideration of the issue.

In its Motion to Dismiss the Commonwealth's Complaint, (and again in its Motions for Summary Judgment against all three of the plaintiffs in this case) Bull argued that the OWBPA does not itself create an independent cause of action, and further that the ADEA's broad enforcement scheme does not extend to enforcement of the OWBPA's waiver conditions. Bull suggested that "the only way to test the validity of a waiver is when it is offered as a defense to an actual ADEA claim." *Bull I*, 16 F.Supp.2d at 106. I responded that this "crabbed reading of the [ADEA's] enforcement provision" would severely undermine the purposes of the OWBPA, as employees would be unable to challenge directly the validity of a waiver or release, and would be dissuaded from filing substantive ADEA claims by any penalties contained in the same questionable waiver or release. *Id.* Adoption of this reading would therefore create an incentive for employers to violate the OWBPA, as long as the offending waiver or release included a sufficiently draconian

---

**50.** As noted above, I addressed this argument in *Bull I*, in the context of Bull's Motion to Dismiss the Commonwealth's Complaint.

penalty for bringing a substantive suit— clearly an illogical result. *Cf. Oubre,* 522 U.S. at 427, 118 S.Ct. 838 (noting, in a discussion of ratification of an invalid waiver of ADEA claims, that "[i]n many instances a discharged employee likely will have spent the monies received and will lack the means to tender their return. These realities might tempt employers to risk noncompliance with the OWBPA's waiver provisions, ... relying on ratification. We ought not to open the door to an evasion of the statute by this device.").

In the specific context of Madigan's substantive claims for age-discrimination damages, however, Bull's argument is more cogent. Bull argues that the only remedy to which Madigan is entitled is the relief to which he would have been entitled had the employer decided not to use a waiver at all. That is, although violation of the OWBPA invalidates a waiver, (and an employee may well be entitled to a declaratory judgment voiding it) the same violation does not itself entitle Madigan to damages in the absence of substantive age discrimination.

I find this argument persuasive. The ADEA's cause of action provision enables "any person aggrieved" to bring a claim "for such legal or equitable relief as will effectuate the purposes" of the statute. 29 U.S.C. § 626(c). The statute's purposes include "promot[ion of] employment of older persons based on their ability rather than age;" and elimination of "arbitrary age discrimination in employment." 29 U.S.C. § 621(b). A cause of action to enforce the OWBPA's provisions (for example, through a judgment declaring a waiver invalid) directly "effectuate[s]" these purposes by ensuring that older employees

only waive their ADEA claims voluntarily and knowingly. An action for *damages* based on OWBPA violations, however, is more complex. There is no measure of damages deriving from an invalid waiver that is separate and distinct from an employee's interest in escaping age discrimination. Madigan's claim for damages deriving from Bull's OWBPA violations themselves, without more, cannot stand. *Piascik–Lambeth v. Textron Automotive Co., Inc.,* 2000 WL 1875873 (D.N.H.2000) (unpublished decision) (reaching a similar conclusion, and specifically distinguishing *Bull I* ). Accordingly, Bull is entitled to judgment as a matter of law on this portion of Count III (Madigan's Complaint ¶ 55).

### b. *Exhaustion of administrative remedies*

 Bull's second argument supporting summary judgment of Madigan's substantive age-discrimination claims relates to Madigan's failure to allege age discrimination in his administrative filings with the MCAD. Bull notes that filing of an administrative charge with the EEOC and the MCAD is "a prerequisite to the commencement of a civil action under the ADEA." *Powers v. Grinnell Corp.,* 915 F.2d 34, 37 (1st Cir.1990). Although Madigan did file a Charge of Discrimination ("Charge") with the MCAD (and simultaneously with the EEOC) on March 23, 1995, he made no mention of discrimination on the basis of age, indicating only that he "believe[d] that [he] was discriminated against by Bull ... on the basis of disability and retaliation." [51] Madigan's Charge of Discrimination, Particulars. Further, Bull indicates that although Madigan's counsel [52] mentioned a

---

51. In fact, Madigan's Charge nowhere mentions his age.

52. Although Madigan submitted his original MCAD complaint pro se, he was represented by counsel at the time of the MCAD investigative conference.

potential age-discrimination claim at the MCAD's investigative conference, held on June 7, 1995, and represented that she would file an amended complaint adding that claim, she never did so. As a result, the MCAD's investigation of Madigan's complaint extended only to his allegations of disability discrimination.[53]

Madigan attempts to save his age-discrimination claims by observing that the "'exact wording of the charge of discrimination need not presage with literary exactitude the judicial pleadings which may follow,'" *Powers*, 915 F.2d at 39 (citing *Tipler v. E.I. duPont deNemours & Co.*, 443 F.2d 125, 131 (6th Cir.1971) (internal citations omitted)), and that the "critical question is whether the claims set forth in the civil complaint come within the 'scope of the . . . investigation which can reasonably be expected to grow out of the charge of discrimination,'" *id.* (*citing Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir.1970)). Madigan argues that because his age-related claims were discussed at the MCAD's investigative conference, those claims necessarily fall within the scope of the investigation that could reasonably have been expected to grow out of Madigan's Charge.

Under the particular facts of this case, I disagree. It may well be true that in many circumstances, a party's mention of alternate theories of discrimination during an MCAD investigative conference is sufficient to bring those theories within the likely scope of an MCAD investigation. In this case, however, Madigan's counsel specifically indicated that she would file an amended complaint to add Madigan's age-related claims, and then she failed to do so. This change of course likely indicated to MCAD—and to Bull—that Madigan had decided not to pursue his age-related claims. I therefore find that Madigan's age-related claims fall outside the scope of any MCAD investigation likely to "grow out of" Madigan's various representations to and interactions with the agency.[54] Accordingly, Bull is entitled to summary judgment of these claims due to Madigan's failure to exhaust administrative remedies.[55]

### 3. Count IV: Violation of the ADA, 42 U.S.C. § 12112

 With respect to Madigan's claim of disability discrimination, Bull argues it is entitled to summary judgment because Madigan's Release, executed in 1994, validly waives his disability-related claims *even though the same Release is invalid as to Madigan's age-related claims.*[56] In sup-

53. I recognize, however, that "'it is not the scope of the actual investigation pursued that determines what [judicial] complaint may be filed.'" *Powers*, 915 F.2d at 39 n. 4 (*citing Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 128 (7th Cir.1989)).

54. Although neither party raises this point, I note that the standard for exhaustion may in fact be *stricter* for Madigan's state law claim, as "some recent Massachusetts state court decisions indicate . . . that a plaintiff cannot bring a [state] discrimination claim in court unless the MCAD complaint *explicitly stated and described the type of discrimination alleged.*" *Silva v. Hit or Miss*, 73 F.Supp.2d 39, 41 (D.Mass.1999) (emphasis added).

55. This holding does not prevent Madigan from re-raising his age claims with the MCAD, particularly in light of this Opinion's holdings regarding the validity of Madigan's Release of his ADEA rights. (For the reasons discussed earlier in the context of the Commonwealth and the EEOC's claims, I do not now address the statute-of-limitations concerns raised by such a re-filing.)

56. Bull does not admit that Madigan's Release violates the OWBPA. Rather, the company argues that even if the Release is invalid under the OWBPA, it remains valid with respect to any non-ADA claims. The distinction is unimportant, however, in light of my findings elsewhere in this Opinion.

port of this position, Bull maintains that the specific protections of the OWBPA extend only to claims of age discrimination under the ADEA. Further, Bull notes that both the Supreme Court and the First Circuit have implicitly recognized that a release or waiver may be invalid as to ADEA claims but valid as to non-ADEA claims. *Oubre,* 522 U.S. at 428, 118 S.Ct. 838 (indicating that questions of "restitution, recoupment, or setoff against the employee ... may be complex where a release is effective as to some claims but not as to ADEA claims"); *American Airlines,* 133 F.3d at 121 (indicating that a ruling regarding the validity of ADEA releases under the OWBPA does not "automatically dispose of the remainder" of an employee's claims (citing *Long v. Sears Roebuck & Co.,* 105 F.3d 1529, 1545 (3d Cir.1997))).

Although I agree with Bull that it is at least possible that a waiver could violate some technical provision of the OWBPA and nevertheless validly waive all non-ADEA claims, I do not agree that the record now before me eliminates all genuine issues of material fact regarding the validity of *Madigan's* waiver of his ADA claims. To be enforceable, "ADA waivers and releases must be knowing and voluntary, as evidenced by the totality of the circumstances." *Rivera–Flores v. Bristol–Myers Squibb Caribbean,* 112 F.3d 9, 10 (1st Cir.1997). Various factors are relevant to this inquiry, including the amount of time a plaintiff was given to study the waiver agreement, and the presence or absence of independent advice (such as that of counsel). In this case, there is some question as to the precise amount of

time Madigan was given to consider the waiver, and there is considerable question as to whether Bull made coercive phone calls to Madigan—circumventing his counsel—that scared him into executing the Release. In light of these unresolved issues, I cannot find, as a matter of law, that Madigan voluntarily and knowingly waived his right to file all non-ADEA claims. Accordingly, Bull's request for summary judgment of Count IV is hereby **DE-NIED.**[57]

### 4. *Count VI: Violation of ERISA*

Next, I turn to Madigan's charge that Bull's treatment of him violates ERISA. As Bull notes, in order to establish an ERISA violation, "a plaintiff must present sufficient evidence from which the employer's specific intent to interfere with the plaintiff's [retirement] benefits can be inferred." *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 38 (1st Cir.1995). In this case, Madigan's sole factual support for his ERISA claim is that he was laid off about eighteen months before he would have become entitled to enhanced retirement benefits, and that Bull knew he was intent on remaining employed with the company until those benefits vested. Madigan offers no other facts to support his contention that Bull intended to interfere with his ERISA rights. As Madigan was apparently laid off as part of a large-scale RIF, however, it is unreasonable to presume, in the absence of any additional evidence, that the timing of his termination was deliberately chosen to interfere with the vesting of his retirement benefits.[58]

---

**57.** Bull also suggests that Madigan ratified his waiver of his ADA claims by failing to tender back the severance benefits he received in consideration therefor. As discussed above, however, there is some question as to whether Bull formed an implied contract with its employees, under which they were entitled to

receive the severance benefits whether or not they executed a Release. *Supra* p. 150. In light of this factual uncertainty, I decline to hold, as a matter of law, that Madigan ratified his potentially invalid waiver of ADA claims by retaining his severance benefits.

Further, even if Madigan could substantiate a *prima facie* claim of intentional interference with ERISA rights, Bull would then be entitled to "articulate ... a non-discriminatory reason for its" decision to terminate him; the burden would then shift back to Madigan to prove "(1) that [Bull's] articulated reason for its employment actions was a pretext; and (2) that the true reason was to interfere with [Madigan's] receipt of benefits." *Barbour*, 63 F.3d at 39 (emphasis added). In anticipation of this line of argument, Bull indicates that Madigan's termination resulted from Bull's decision to conduct an RIF at the Lawrence facility, where Madigan originally worked, and further, that this RIF was "economically motivated and resulted from a change in business priorities and cost cutting measures." Bull's Memorandum in Support of its Motion for Summary Judgment against Madigan at 17. Madigan responds to this proposed, legitimate non-discriminatory reason for his termination with vague references to Bull's evident concern about the costs of its pension obligations and the unsupported assertion that "a desire to reduce pension liability was a determining factor in [Madigan's] discharge." In the absence of any suggestion that Bull made its decision to terminate *him* based on its concern about the costs of *his* pension obligations, however, "mere awareness of the high cost of pen-

sion obligations ... [is] insufficient ... to establish ... discriminatory intent," *Lehman v. Prudential Ins. Co. of Am.*, 74 F.3d 323, 331 (1st Cir.1996), and it falls far short of the sort of factual support that would be necessary to prove pretext.

Thus, on the record before me, I find no genuine issue of fact that Bull acted with the specific intent necessary to support an ERISA claim. Accordingly, Bull's Motion for Summary Judgment is **GRANTED** as to Count VI of Madigan's Complaint.

### 5. *Count VII: Violation of M.G.L. 151B, § 4*

 Finally, I turn to Madigan's remaining state law claims, recalling that I have already granted summary judgment against Madigan on his age-related claims, due to his failure to exhaust his administrative remedies. Bull argues that it is also entitled to summary judgment on the remainder of the claims in Count VII, because Madigan failed to file a timely complaint with the MCAD. In support of this assertion, Bull argues that Madigan's Charge was filed on March 23, 1995, six-months and two-days after Madigan stated in writing that he wished to take a lay-off, and therefore two-days after the statute of limitations of M.G.L. c. 151B had passed. I need not consider the merits of this argument, as Bull failed to raise its timeliness concerns either in its answers to Madigan's Complaint,[59] or in its Partial Motion to Dismiss. The company has

---

**58.** Madigan requests an opportunity to amend his Complaint to add additional support for his ERISA claim. Given that more than three years have passed since this action was originally filed, I simply cannot grant leave to file an amended complaint unless Madigan shows some valid reason for his delaying in requesting permission to amend. *Grant v. News Group Boston, Inc.*, 55 F.3d 1, 6 (1st Cir.1995) (" 'Where ... considerable time has elapsed between the filing of the complaint and the motion to amend, the movant has the burden of showing some valid reason for his neglect

and delay.' " (quoting *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 933 (1st Cir.1983) (internal citations omitted))).

**59.** The only reference to procedural requirements in Bull's Answer is its Fourth Defense, "[t]he plaintiff has failed to comply with procedural, administrative, and jurisdictional requirements for bringing his claims, including the failure to exhaust administrative remedies." This broad assertion, in response to Madigan's seven-count Complaint, is insuffi-

therefore waived its right to rely on this affirmative defense. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) (holding, in the Title VII context, "that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling"); *Christo v. Edward G. Boyle Ins. Agency,* 402 Mass. 815, 525 N.E.2d 643, 645 (1988) (citing *Zipes* with approval and reaching the same conclusion with respect to the six-month statute of limitations in M.G.L. 151B). Accordingly, summary judgment is hereby **DENIED** as to the non-age-related portions of Count VII.

## IV. CONCLUSION

In conclusion, all four Motions for Summary Judgment filed in this case are **GRANTED in part and DENIED in part.** Bull is entitled to summary judgment of the EEOC's FLSA claims, and of Madigan's age-discrimination and ERISA claims. The Commonwealth and the EEOC are entitled to judgment as a matter of law regarding the invalidity of the 1994 and 1996 Releases. Further, Bull is **ORDERED** to provide all employees who executed the invalid Releases with a copy of this decision.

The outstanding triable issues in this case are therefore:

1. Whether the 1994—1996 RIFs composed a single "employment termination program" for purposes of the OWBPA (and, in turn, what information Bull must now provide to employees affected by those RIFs);

2. The adequacy of the information packets provided to employees who executed the 1996 Releases (and, in turn, what information Bull must now provide to employees who executed those Releases);

3. The validity of the 1998 Releases;

4. All statute of limitations issues relating to potential future age-discrimination actions brought by individual employees who executed invalid Releases;

5. The validity of Madigan's waiver of his ADA claims and rights;

6. The merits of Madigan's ADA claims; and,

7. The merits of Madigan's non-age-related claims under M.G.L. c. 151B.

**A status conference is scheduled in this case for Tuesday, July 24, 2001, at 2:30 p.m. in Courtroom 2, on the 3rd Floor.**

**SO ORDERED.**

---

cient to notify Madigan of his alleged violation of the six-month statute of limitations in M.G.L. c. 151B, particularly given that Bull also failed to raise its timeliness concerns in its Partial Motion to Dismiss.